Stephanie BRUKER, Plaintiff,

v.

CITY OF NEW YORK; New York City Department of Social Services/Human Resources Administration/Child Welfare Administration, currently operating as Administration of Children's Services; Robert Little, in his individual capacity and in his official capacity as Commissioner of the New York City Child Welfare Administration; Dolores Perry, in her individual capacity and in her official capacity as a caseworker for the New York City Child Welfare Administration; Catholic Home Bureau; Father Flannegan's Boystown, New York; Mayor Rudolph Giuliani, in his individual capacity and in his official capacity; Deputy Mayor John Dyson, in his individual capacity and in his official capacity; Marva Livingston Hammons, in her individual capacity and in her official capacity as Commissioner of the Human Resources Administration; and Katherine Kroft, in her individual capacity and in her official capacity as Executive Deputy Commissioner of the Human Resources Administration, Defendants.

No. 93 CIV. 3848(MGC).

United States District Court, S.D. New York.

March 31, 2000.

Opinion Denying Reconsideration, April 27, 2000.

Stephanie Bruker, Riverdale, NY, pro se.

Suzanne M. Halbardier, Barry, McTiernan & Moore, New York City, for Defendants.

Eileen B. Eglin, Traub Eglin Lieberman Straus, Hawthorne, NY, for Defendant.

## OPINION

CEDARBAUM, District Judge.

Plaintiff's principal grievance in this action is that New York City, immediately upon removing plaintiff's daughter from her custody, deliberately and totally ignored the fact that both plaintiff and her daughter were avowedly Jewish, and placed the daughter through a Catholic foster care agency into a Catholic foster home.

This action was commenced on June 8, 1993. Stephanie Bruker filed the original complaint in her own behalf and in behalf of her minor children, Elizabeth–Ann Marcovitz ("Elianne"), born June 5, 1979, and Allison Natalie Marcovitz ("Allison"), born November 11, 1976. The original complaint named as defendants the City of New York, the City of New York Department of Social Services, Human Resources Administration, Child Welfare Administration ("CWA"),[1] Robert Little, Commissioner of the New York City Child Welfare Administration, Dolores Perry, caseworker for the New York City Child Welfare Administration, and the Catholic Home Bureau, a private foster care placement agency.

On January 12, 1994, plaintiff requested that the case be placed on the suspense docket pending the outcome of ongoing proceedings in the New York Family Court. The case was placed on the suspense docket by order dated January 20, 1994. On June 5, 1998, the case was restored to active status at plaintiff's request.

Plaintiff filed an amended complaint on June 1, 1999. By that time, both of plaintiff's daughters had passed age eighteen. Therefore, the amended complaint asserts only the claims of the parent, Stephanie Bruker. In the amended complaint, plaintiff added several defendants: Mayor Rudolph Giuliani, Deputy Mayor John Dyson, Marva Livingston Hammons, Commissioner of the Human Resources Administration, Katherine Kroft, Executive Deputy Commissioner of the Human Resources Administration, and Father Flannegan's Boystown. The amended complaint seeks relief pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1988 and related state law causes of action.

Defendants City of New York, the CWA, Little, Perry, Giuliani, Dyson, Hammons, and Kroft (the "municipal defendants") move to dismiss the amended complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted and on the ground that all claims are barred by collateral estoppel. The Catholic Home Bureau has joined the motion of the municipal defendants. Defendants Giuliani, Dyson, Hammons, and Kroft also move to dismiss the amended complaint on the ground that all claims against them are barred by the statute of limitations. Defendants Giuliani, Dyson, Hammons, Kroft, and Little move to dismiss on the ground that they were not personally involved in the violation of plaintiff's rights as required for § 1983 liability. Father Flannegan's Boystown has not joined the motion. For the reasons that follow the motion is granted in part and denied in part.

## ALLEGATIONS OF THE COMPLAINT

On June 8, 1992,[2] the CWA removed plaintiff's daughters, Elianne and Allison,[3]

---

1. The Child Welfare Administration is now called the Administration for Children's Services. Since the amended complaint uses the former title, that title is used throughout this opinion.

2. Plaintiff asserts a different removal date in her Memorandum of Law in Opposition to the Motion to Dismiss and in supplemental documentation that she has submitted to the court. In these documents she states that Elianne

from plaintiff's custody. The CWA did not request a hearing prior to removing the children. (Am. Compl. ¶ 20.) The amended complaint alleges that the removal was effected without any prior investigation. (Am.Compl.¶ 74.) It also alleges that there was no reason for the CWA to remove plaintiff's daughters from her custody without first holding a hearing. (Am. Compl.¶ 27.)

The CWA placed Elianne in the care of the Catholic Home Bureau. The Catholic Home Bureau in turn placed Elianne in the home of Susan Savoca, a Catholic foster care giver. (Am.Compl.¶ 27.)

On June 12, 1992, the New York Family Court held a hearing to determine whether Elianne and Allison should be remanded to plaintiff's custody pending the outcome of the neglect proceeding that the CWA had initiated against plaintiff. The June 12 hearing was held pursuant to Section 1028 of the New York Family Court Act which provides that the "court shall grant the application [for an order returning the children to parental custody], unless it finds that the return presents an imminent risk to the [children's] li[ves] or health." N.Y. Fam. Ct. Act § 1028 (McKinney 1999). The Family Court held that returning the girls to plaintiff's custody did not pose an imminent risk to their lives or health and ordered that the girls be returned to plaintiff's custody during the

pendency of the neglect proceeding. (Am. Compl. ¶ 29; *In the Matter of Elianne Marcovitz,* Order dated June 17, 1992.)

The CWA appealed this ruling, and the Family Court granted a stay of the order to return the girls pending the outcome of the CWA's appeal. (*In the Matter of Elianne Marcovitz,* Order dated July 10, 1992). On July 28, 1992, plaintiff and the CWA agreed that the CWA would withdraw its appeal and return Allison to plaintiff's custody provided plaintiff voluntarily placed Elianne in the custody of the CWA. (*In the Matter of Elianne Marcovitz,* Order dated July 28, 1992.)

After her removal from plaintiff's custody on June 8, 1992, Elianne remained in the physical custody of the CWA which placed her through the Catholic Home Bureau in the home of foster parent Savoca. (Am.Compl.¶ 33.) Plaintiff voluntarily placed Elianne in the custody of the CWA as of July 28, 1992 when she entered into a stipulation with the CWA in exchange for its withdrawal of its appeal of the Family Court's ruling on the 1028 hearing.

Plaintiff alleges that the placement of Elianne in the Savoca home was against her wishes and violated her rights with respect to her daughter's placement. Plaintiff is Jewish and clearly expressed her desire to have her daughter placed with a Jewish foster care agency and in a Jewish foster home. Savoca is Catholic. Plaintiff alleges that the CWA refused to place her daughter in a Jewish foster home despite its knowledge of plaintiff's [4]

was removed from her custody on June 9, 1992. (Pl. Mem. at 3; Pl. Supplemental Submissions at 1.) The family court order returning the children to plaintiff's custody refers to June 5, 1992, the date on which the CWA apparently filed a neglect petition against plaintiff. (*In the Matter of Elianne Marcovitz,* Order dated June 17, 1992.) The exact date of Elianne's removal from plaintiff's custody is not critical to the disposition of this motion. In the absence of any official documentation confirming the date of Elianne's removal, June 8, 1992, the date that appears on the face of the complaint, is assumed to be the date on which Elianne was removed from plaintiff's custody.

3. It appears that Allison was hospitalized at this time. Therefore, the removal of Allison

from plaintiff's custody was a technical one. Plaintiff's allegations that the procedure followed when her daughters were removed speak only to Elianne. Thus, the amended complaint alleges violations of plaintiff's rights only with respect to defendants' removal and placement of Elianne.

4. Plaintiff had informed the CWA of her religious affiliation as early as March of 1992. In March of 1992, plaintiff had voluntarily placed Allison in the custody of the CWA because of Allison's psychiatric problems. (Am.Compl.¶ 20.) When Allison was placed at that time, the CWA complied with plaintiff's request that she be placed in a Jewish foster home. (Am.Compl.¶ 21.)

and Elianne's [5] religious affiliation. (Am. Compl.¶ 27.) Plaintiff made numerous requests that Elianne be transferred to a Jewish foster care agency. The CWA and Commissioner Little wilfully ignored these requests. (Am.Compl.¶ 33.)

Plaintiff alleges that the foster care Savoca provided for her daughter was deficient in several other respects. While in Savoca's care, Elianne was truant from school 83 times during the course of one semester and failed in over half of her courses. Savoca permitted Elianne to engage in inappropriate activities, including smoking and engaging in sexual intercourse. Plaintiff complains that the CWA, the Catholic Home Bureau, and Perry were fully aware of Elianne's behavior while in Savoca's care, but took no action to rectify the situation. (Am.Compl.¶ 30.)

According to the amended complaint, Savoca attempted to alienate Elianne from plaintiff by publicly berating plaintiff, making numerous press appearances, and generally aggravating the existing tension between plaintiff and her daughter. (Am. Compl.¶ 28.)

On September 24, 1992, at plaintiff's request, the Family Court held a hearing to determine whether Elianne should be transferred to a Jewish foster care agency and a Jewish foster home. During the course of this hearing, Perry falsely testified that Savoca, although Catholic, was keeping a kosher home and raising Elianne in accordance with Jewish traditions. The Family Court ordered the CWA to remove Perry from the case because she had submitted a false affidavit to the court and had demonstrated personal animosity toward plaintiff. (Am. Compl. ¶ 35; *In the Matter of Elianne Marcovitz,* Addendum Decision and Order dated Sept. 24, 1992.)

The Family Court also ordered the CWA to transfer Elianne from the custody of the Catholic Home Bureau to a Jewish foster care agency. (Am. Compl. ¶ 36; *In the Matter of Elianne Marcovitz,* Decision and Order dated Sept. 24, 1992.) The CWA appealed the decision. The Appellate Division affirmed the Family Court's ruling by opinion dated December 22, 1992. *In the Matter of Elianne M.,* 184 A.D.2d 98, 592 N.Y.S.2d 296 (App. Div. 1st Dep't 1992).

On that same day, Elianne ran away from Savoca's home to an undisclosed place. (Am.Compl.¶ 39.) During the time that Elianne was missing from the Savoca home, she made several media appearances. The press reported that Elianne had been abused by her mother and now had to leave her foster home to be transferred to a Jewish home against her wishes. (Am.Compl.¶ 44.)

Upon learning of Elianne's case from such reports, Pamela Liapakis,[6] an attorney, offered to represent Elianne and replace her court-appointed counsel. (Am. Compl.¶ 48.) Elianne sought leave of the court to replace her court-appointed counsel with Liapakis. The Family Court denied this request. (*In the Matter of Elianne Marcovitz,* Order dated Jan. 12, 1993.) Plaintiff alleges that the CWA nonetheless improperly gave Liapakis confidential papers, which Liapakis then disclosed to the press. (Am.Compl.¶ 50.)

After learning that Elianne had run away from the Savoca home, the Family Court issued a warrant for her return to the court. (Am.Compl.¶ 49.) Approximately one month later, in early February of 1993, Elianne was returned to court on the warrant. The CWA then placed Elianne with OHEL, a Jewish foster care agency. (Am.Compl.¶ 53.)

While Elianne was placed with OHEL, plaintiff and the CWA reached an agree-

---

**5.** At the September 1992 Family Court hearing, Elianne's law guardian "represented the child's wishes and argue[d] that the child ha[d] ... strong ties to her Jewish faith." (*In the Matter of Elianne Marcovitz,* Decision and Order dated Sept. 24, 1992.)

**6.** Ms. Liapakis is not a defendant in this action. The amended complaint alleges that the CWA gave Liapakis confidential information about plaintiff's case.

ment to modify the terms of Elianne's voluntary placement. Plaintiff agreed to leave Elianne in the custody of the CWA for one year during which Elianne would live in a Jewish foster home and receive psychiatric care. In return, the CWA agreed that at the end of the year it would dismiss the neglect proceeding pending against plaintiff. (Am.Compl.¶ 54.) This agreement was never finalized, however, because Liapakis, the attorney purporting to represent Elianne, threatened to bring suit against both Little and the CWA in behalf of Elianne should the agreement be executed. Plaintiff alleges that Little and the CWA illegally withdrew the agreement in response to this threat. (Am. Compl.¶ 55.)

Elianne remained in the custody of OHEL, but had difficulty adjusting to her new environment. In approximately four months, Elianne had three separate foster home placements. After the third placement, OHEL recommended to the CWA that Elianne receive a psychiatric evaluation. (Am.Compl.¶ 57.) On June 17, 1993, the CWA placed Elianne in the Four Winds Hospital where an evaluation was conducted. (Am.Compl.¶ 57.) At this time, plaintiff reached another tentative agreement with the CWA to modify the terms of Elianne's voluntary placement. This agreement provided that the CWA would abide by the recommendations of Four Winds Hospital and Tom Croke, an educational consultant for children with special needs, whom plaintiff had hired. (Am.Compl.¶ 58.) The Four Winds Hospital report recommended that Elianne be paroled to plaintiff's custody. Plaintiff planned to send Elianne to a private therapeutic boarding school in Utah for treatment. The CWA did not follow the recommendations of the Four Winds Hospital. (Am.Compl.¶ 59.)

Sometime later, although it is not clear from the amended complaint exactly when, Elianne signed herself out of Four Winds Hospital, and the CWA placed her in another treatment center, the Catholic Institution of Edwin Gould. Elianne remained in this treatment center for 18 months. (Am.Compl.¶ 62.)

In October of 1994, the CWA transferred Elianne from Edwin Gould to Father Flannegan's Boystown of New York ("Boystown"), another Catholic agency. At this time, Boystown sent Elianne to Catholic parochial school where she was educated in the Catholic faith. (Am. Compl.¶ 63.)

Because Elianne was a Canadian citizen, External Affairs Canada moved in January of 1995 to become involved in the state court case in an attempt to return Elianne to Canada. (Am.Compl.¶ 64.) The Canadian government's consular service in New York attended all court hearings from January 1995 through the end of the family court case. The CWA opposed the appearance of External Affairs Canada. (Am.Compl.¶ 67.)

External Affairs Canada attempted to notify defendants Kroft, Hammons, and Dyson that Elianne was a citizen of Canada and that Canada therefore had an interest in the case. (Am.Compl.¶ 65.) Plaintiff personally delivered a letter to Mayor Giuliani to advise him of the Canadian government's desire to be contacted regarding Elianne's custody. Mayor Giuliani never responded. (Am.Compl.¶ 66.)

On July 6, 1995, the Family Court found plaintiff guilty of neglect in the proceeding originally initiated by the CWA in June of 1992. (Am.Compl.¶¶ 69–71.) Plaintiff appealed that decision. (*In the Matter of Elianne Marcovitz,* Notice of Appeal dated Nov. 2, 1995.)

On September 28, 1995, the Family Court entered an order directing that Elianne remain at Boystown until her eighteenth birthday, June 5, 1996. The order also denied plaintiff visitation and directed that family therapy continue. (*In the Matter of Elianne Marcovitz,* Order dated Sept. 28, 1995.)

After granting plaintiff two extensions of time in which to perfect her appeal, the Appellate Division dismissed the appeal

*sua sponte* on February 4, 1997. (Am. Compl. ¶ 72; *In re Elianne M.*, 236 A.D.2d 897, 654 N.Y.S.2d 282 (App. Div. 1st Dep't 1997)).

## THE CLAIMS

The amended complaint contains ten counts against various combinations of defendants.

Counts One and Ten allege that the CWA and Commissioner Little have a policy of tolerating perfunctory investigations and permitting CWA caseworkers to file false claims. The amended complaint also alleges that, in plaintiff's case, the CWA, Little, and Perry failed to investigate adequately before removing plaintiff's daughters from her custody, and that plaintiff was deprived of procedural due process because she was not afforded a predeprivation hearing.

Count Two alleges that the CWA, Little, the Catholic Home Bureau, and Perry failed to properly supervise the foster parent Savoca and failed to intervene when informed of Savoca's failure to care adequately for Elianne.

Count Three alleges that the CWA, Little, Perry, the Catholic Home Bureau, and Boystown failed to provide adequate reunification services to plaintiff so that she could retain a relationship with her daughter.

Counts Four, Five, and Six allege a violation of plaintiff's right to the free exercise of her religion. These counts allege that the CWA, Little, and Perry wilfully placed Elianne in a non-Jewish home; and that these defendants and the Catholic Home Bureau failed to adequately train foster mother Savoca in Jewish customs. Plaintiff also complains that she was improperly forced to testify about her religious convictions in court.

Count Seven alleges that plaintiff's due process rights were violated because the Catholic Home Bureau, CWA, Little, and Boystown failed to provide Elianne with the psychiatric treatment plaintiff desired for her.

Count Eight alleges that the CWA's release of information about her case to "non-parties" violated plaintiff's right of privacy.

Count Nine alleges that the CWA maliciously prosecuted plaintiff by forcing her to appear in court over a three-year period.

Plaintiff also lists as pendent New York state law tort claims "malicious prosecution, intentional infliction of emotional distress, abuse of process, slander, libel, negligence, gross negligence, negligent supervision, negligent hiring, and negligent training" without further elaboration or identification of any particular defendant. (Am.Compl.¶ 155.)

## DISCUSSION

In deciding defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the factual allegations of the complaint must be accepted as true, *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 164, 113 S.Ct. 1160, 1161, 122 L.Ed.2d 517 (1993), and all reasonable inferences must be drawn in favor of plaintiff, *Dangler v. New York City Off Track Betting Corp.*, 193 F.3d 130, 138 (2d Cir.1999). When evaluating a Rule 12(b)(6) motion to dismiss, "consideration is limited to the factual allegations in plaintiff['s] amended complaint, which are accepted as true, to documents attached to the complaint as ... exhibit[s] or incorporated in it by reference ... or to documents either in plaintiff['s] possession or of which plaintiff[ ] had knowledge and relied on in bringing suit." *Brass v. American Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir.1993). Plaintiff has submitted a list of state court proceedings regarding the removal and placement of Elianne and has attached copies of many court documents from those proceedings. These documents are referred to throughout plaintiff's amended complaint and are properly treated as exhibits attached to the amended complaint. Thus, these docu-

ments have been considered in deciding this motion.

■ A motion to dismiss should be granted only if it appears beyond doubt that plaintiff can prove no set of facts that would entitle her to relief. *Id.* Moreover, when a party proceeds pro se, the papers should be read liberally and "interpret[ed] ... to raise the strongest arguments that they suggest." *Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995) (citation and internal quotation marks omitted); *see also Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972) (per curiam) (explaining that pro se complaints are held to less stringent standards than pleadings drafted by lawyers).

## I. STATUTE OF LIMITATIONS

■ Defendants Giuliani, Dyson, Hammons, and Kroft argue that the statute of limitations bars plaintiff's claims against them. The statute of limitations for a § 1983 action in New York is three years. *Harris v. City of New York,* 186 F.3d 243, 247–48 (2d Cir.1999). The statute of limitations begins to run "when the plaintiff knows or has reason to know of the injury which is the basis of his action." *Pinaud v. County of Suffolk,* 52 F.3d 1139, 1156 (2d Cir.1995) (quoting *Singleton v. City of New York,* 632 F.2d 185, 191 (2d Cir.1980)).

Plaintiff did not name these individuals as defendants until she filed her amended complaint on June 1, 1999. Therefore, unless the claims against these defendants relate back to the original complaint, plaintiff's claims arising from the conduct of these defendants prior to June 1, 1996 are time-barred.

Plaintiff's claim against these defendants is very vague. The amended complaint generally alleges that they knew of plaintiff's objections to the CWA's placement of her daughter, but that they failed to intervene despite their responsibility to do so. More specifically, the amended complaint alleges that in 1995 both plaintiff and the Canadian government notified these defendants of the events in question, but they

took no action to resolve the identified problems or to turn Elianne over to Canadian authorities.

Plaintiff's claim against these defendants is limited to the period during which her daughter was placed in a Catholic home or Catholic agency despite the 1992 Family Court order directing that Elianne be placed in a Jewish home or agency. Plaintiff cannot complain about any failure to intervene on the part of these defendants after September 28, 1995 because on that date her daughter's placement was ordered by the Family Court. These defendants cannot be held liable for any failure to intervene once the Family Court directed the placement of Elianne in a Catholic facility. Thus, the only actionable behavior of these defendants, if any, occurred before September 28, 1995.

### A. Relation Back

Fed.R.Civ.P. 15(c) governs the relation back of amendments to complaints. Rule 15(c) authorizes relation back when "the claim[s] ... asserted in the amended [complaint] arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original [complaint]" and "the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party." Fed.R.Civ.P. 15(c)(2)-(3).

■ Plaintiff's claims against Giuliani, Hammons, Dyson, and Kroft do not relate back because there is no reason for these defendants to have known that plaintiff intended to name them, but made a mistake when she did not name them in her original complaint. There is no allegation in plaintiff's original complaint that supervisory personnel or city officials failed to act when they had a responsibility to do so. There is also no allegation, nor could there be since the original complaint was

filed in 1993, that supervisory personnel or city officials ignored official communications from Canada about this case. The original complaint contained no facts from which the Mayor, the Deputy Mayor, the Commissioner of the Human Resources Administration, and the Executive Deputy Commissioner of the Human Resources Administration should have known that this action was in effect brought against them in addition to the named defendants. Thus, plaintiff's claims against these defendants do not relate back to the original complaint.

### B. Continuing Violation

Plaintiff also argues that the amended complaint alleges violations by these defendants that continued into the three year limitation period. Plaintiff's allegation is that these defendants knew about her plight and failed to act to place her daughter in a Jewish home, although they had a responsibility to do so.

■ As discussed above, on September 28, 1995 the Family Court ordered Elianne to remain at Boystown, a Catholic agency. Plaintiff cannot complain about the failure of these defendants to intervene after that date. The Mayor and other supervisory officials are not obligated by any law to take action to change Elianne's placement once a court has ordered her placement and that order has been followed. Plaintiff had three years from the entry of that order to bring an action against the supervisory officials that she believes should have acted differently before the court order of September 28, 1995. However, plaintiff did not file the amended complaint against these persons within those three years. Accordingly, the claims against Giuliani, Dyson, Hammons, and Kroft are time-barred.

### II. PLAINTIFF'S STANDING TO SUE IN BEHALF OF HER ADULT DAUGHTER

■ At a May 25, 1999 conference, plaintiff conceded that she cannot maintain any claims in behalf of Elianne who is no longer a minor. Apparently the young woman, now twenty, has chosen not to pursue the claims that her mother asserted in her behalf in the original complaint in this action. Count Two alleges that Elianne was inadequately supervised and therefore engaged in inappropriate activities and failed in school. Count Seven alleges that Elianne did not receive the psychiatric care that plaintiff wanted her to receive. When her daughter was placed in the temporary custody of the state, the state undertook to provide her basic needs, including medical care. N.Y. Comp.Codes R. & Regs. tit. 18, § 441.22(a). Plaintiff's daughter is the one with standing to complain if these basic needs were not met. Plaintiff does not have a constitutional right to have her daughter behave in a particular way or to determine her daughter's medical care. Counts Two and Seven fail to state a claim of injury to plaintiff.

### III. SUBSTANTIVE AND PROCEDURAL DUE PROCESS

Plaintiff styles her due process claim in Counts One and Ten as one for a violation of both substantive and procedural due process. However, the facts plaintiff alleges only state a claim for a deprivation of procedural due process. Plaintiff's legal conclusion that she has been denied substantive due process is not sufficient to state a claim of the deprivation of a substantive right without due process of law.

### A. Substantive Due Process

■ The substantive component of the Due Process Clause protects a right to "family integrity." The Second Circuit has described this right as the "right of the family to remain together without the coercive interference of the awesome power of the state." *Duchesne v. Sugarman*, 566 F.2d 817, 825 (2d Cir.1977).

■ Plaintiff's allegations do not involve the "right of the family to remain together." Plaintiff is complaining about the manner in which her daughter was removed from her custody in June of 1992,

not the fact of her removal. Plaintiff voluntarily placed Elianne with the state very shortly after her initial removal. Plaintiff alleges that her daughter was removed without a proper investigation and without a prior hearing. This is a procedural complaint.

### B. Procedural Due Process

In order to state a claim of violation of procedural due process, plaintiff must allege that defendants deprived her of a protected liberty interest without following constitutionally adequate procedures. *Board of Regents v. Roth*, 408 U.S. 564, 569–70, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). Parents have a constitutionally protected liberty interest in the custody of their children. *Stanley v. Illinois*, 405 U.S. 645, 651–52, 92 S.Ct. 1208, 1212–13, 31 L.Ed.2d 551 (1972). Generally, a hearing is the procedure that the Fourteenth Amendment requires before the state may deprive a parent of custody. *See Gottlieb v. County of Orange*, 84 F.3d 511, 520 (2d Cir.1996). However, in case of an emergency, "where there is an objectively reasonable basis for believing that a threat to the child's health or safety is imminent," officials may deprive a parent of custody without the parent's consent or a prior hearing. *Id.; see also Robison v. Via*, 821 F.2d 913, 921 (2d Cir.1987).

Plaintiff states a claim for deprivation of procedural due process. Count Ten alleges that the municipal defendants deprived her of liberty without procedural due process by failing to provide a hearing before Elianne was removed from her custody. Plaintiff's allegations in Counts One and Ten essentially assert that she was entitled to a predeprivation hearing because there was no investigation prior to Elianne's removal that could have revealed an objectively reasonable basis for believing that plaintiff's custody was a threat to her daughter's health or safety. On the face of the complaint, the provable facts cannot be determined.

Plaintiff's procedural due process claim is limited to a claim that she was not afforded a predeprivation hearing. On June 8, 1992, plaintiff's daughter was removed from her custody. On June 12, 1992, plaintiff had a post-deprivation hearing which restored custody to her. The only possible injury to her liberty interest in the custody of her children occurred during the four-day period between the removal of her daughter and the post-deprivation hearing.

## IV. FREE EXERCISE OF RELIGION

Although the right of parents to determine their children's religious upbringing is limited when their children are placed or taken into the custody of the state, parents' wishes with regard to their children's religious training while in state custody are afforded some constitutional protection. *Wilder v. Bernstein*, 848 F.2d 1338, 1346–47 (2d Cir.1988). Parents' right to control their children's religious upbringing is not violated while their children are in the custody of the state "so long as the state makes reasonable efforts to assure that the religious needs of the children are met during the interval in which the state assumes parental responsibilities." *Id.* at 1346–47. *See also Pfoltzer v. County of Fairfax*, 775 F.Supp. 874, 885 (E.D.Va.1991), *aff'd* 966 F.2d 1443, 1992 WL 137512 (4th Cir.1992) ("While a state should attempt to accommodate parents' religious preferences in selecting a foster care placement, such effort need only be reasonable.") (citing *Wilder*, 848 F.2d at 1346–47); *Walker v. Johnson*, 891 F.Supp. 1040, 1048 (M.D.Pa.1995) ("It is appropriate, when the initial placement is made, to give some weight to the child's and/or the parent's religious background and place him or her in a setting consistent with that background, [but] that concern may be overridden" by the best interests of the child.).

Plaintiff alleges that defendants ignored a court order that directed the CWA to place Elianne in a Jewish home.

According to the complaint, the CWA made no effort to place Elianne in a Jewish home from the beginning, and, therefore, did not make the constitutionally required, reasonable effort to place the girl according to the religion of both the mother and the child. Assuming these allegations are true, the amended complaint states a claim for violation of plaintiff's right to the free exercise of her religion. This right is not absolute, but plaintiff is entitled to demonstrate that her right was not outweighed by other relevant considerations. Thus, the motion to dismiss Counts Four and Five must be denied.

## V. PLAINTIFF'S TESTIMONY IN COURT

■ Count Six alleges that plaintiff was forced to testify in court about her religious practices. Plaintiff alleges that during the hearing before the Family Court and in the relevant briefs, the CWA, Little and Perry criticized her religious beliefs. Plaintiff is apparently offended that the court required her to disclose information about her religious beliefs and practices. These facts do not state an actionable claim. Plaintiff cannot sue the CWA, Little, and Perry for providing information requested by the court, particularly when plaintiff herself placed her religious convictions in issue by insisting that her daughter be placed in a Jewish home.

## VI. MALICIOUS PROSECUTION

■ Count Nine alleges that the municipal defendants maliciously prosecuted plaintiff by extending the neglect proceeding over an extensive, three-year period during which plaintiff was forced to attend numerous court proceedings. Malicious prosecution is only actionable under § 1983 "if it implicates the plaintiff's federal statutory or constitutional rights." *Lennon v. Miller,* 66 F.3d 416, 425 (2d Cir. 1995). Plaintiff's claim is that the extensive nature of the neglect proceedings violated her substantive due process right to family integrity. It is not necessary to resolve whether this asserted violation is sufficient to make plaintiff's malicious prosecution claim actionable under § 1983 because plaintiff has not stated facts sufficient to allege all of the essential elements of that claim.

■ If plaintiff could establish that a constitutional right had been violated by the alleged malicious prosecution, the elements of the malicious prosecution claim would be taken from New York law. *Russell v. Smith,* 68 F.3d 33, 36 (2d Cir.1995). In order to prove malicious prosecution under New York law, plaintiff must show that the opposing party initiated a proceeding despite the lack of probable cause, that the proceeding terminated in plaintiff's favor, and that the opposing party acted with malice. *See, e.g., Honzawa v. Honzawa,* 701 N.Y.S.2d 411, 413 (App. Div. 1st Dep't 2000).

■ Plaintiff alleges that the neglect proceeding was prosecuted against her with malice. However, that proceeding terminated with a finding that plaintiff was guilty of neglect. Therefore, plaintiff cannot prove the second essential element of a claim of malicious prosecution.

## VII. LIBEL AND SLANDER

■ The amended complaint does not state a claim for libel or slander under New York law. A cause of action for libel or slander must set forth the defamatory words with particularity. *See, e.g., Ramos v. Madison Square Garden Corp.,* 257 A.D.2d 492, 493, 684 N.Y.S.2d 212, 213 (App. Div. 1st Dep't 1999). Plaintiff has only stated that she has a claim for both libel and slander without identifying any defamatory words that were published by any named defendant. Moreover, the only published statements that could potentially be considered defamatory were made by persons who are not named as defendants. (*See* Am. Compl. ¶¶ 28, 44, 51, alleging that statements made by Savoca to the press defamed plaintiff; Am. Compl. ¶¶ 49, 52, generally alleging that Elianne appeared in the media and created a negative impression of plaintiff; Am. Compl. ¶ 50, al-

leging that Liapakis gave plaintiff's Family Court file to press.)

## VIII. RIGHT TO PRIVACY

Since defendants do not specifically address Count Eight of the amended complaint, it is inappropriate for me to rule on its sufficiency.

## IX. REMAINING STATE LAW CLAIMS

Defendants do not attack the sufficiency of plaintiff's remaining state law claims. They argue only that I should decline to exercise supplemental jurisdiction over these claims once all of the federal claims have been dismissed. Plaintiff has two federal claims remaining. Her remaining state law claims are therefore not dismissed as against the municipal defendants.

However, plaintiff has no federal claims remaining against the Catholic Home Bureau. Title 28 U.S.C. § 1367 governs the supplemental jurisdiction of federal courts. A federal court has supplemental jurisdiction "over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). However, a court "may decline to exercise supplemental jurisdiction over a claim under subsection (a) if ... (3) the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). I decline to exercise supplemental jurisdiction over the state law claims against the Catholic Home Bureau under 28 U.S.C. § 1367.

## X. QUALIFIED IMMUNITY [7]

 Qualified immunity protects government officials from suit for performing discretionary functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Because officials should not be discouraged from exercising their discretion, qualified immunity should be resolved "at the earliest possible stage of litigation." *Anderson v. Creighton,* 483 U.S. 635, 646 n. 6, 107 S.Ct. 3034, 3042 n. 6, 97 L.Ed.2d 523 (1987); *Robison,* 821 F.2d at 920. In *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985), the court stated that "[u]nless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery."

The first issue that must be addressed in evaluating the defense of qualified immunity is whether the right in question was clearly established at the time the defendant acted. The constitutional rights which plaintiff alleges were violated and as to which the defendants claim qualified immunity were clearly established at the time at which defendants acted.[8]

 In 1992 it was clearly established that, in the absence of a threat to the child's health or safety, due process requires that a predeprivation hearing be held before a parent is deprived of the custody of her children. *See Cecere v. City of New York,* 967 F.2d 826, 829 (2d Cir. 1992) (holding that in 1986 it was well established that due process requires a hearing before a child can be taken from a parent's custody unless the child is in imminent danger).

---

**7.** Defendants also argue that Perry is entitled to absolute immunity for her false testimony. However, plaintiff does not seek damages for false testimony. The Family Court found that Perry had testified falsely. (*In the Matter of Elianne Marcovitz,* Addendum Decision and Order dated Sept. 24, 1992.) Plaintiff is entitled to present this fact as evidence of Perry's state of mind when she placed Elianne with Savoca. It may also be useful as evidence of negligent hiring, training and supervision on the part of the CWA.

**8.** The defendants do not address plaintiff's claim of violation of her right of privacy.

 The aspect of plaintiff's right to free exercise of religion that plaintiff claims was violated was also clearly established in 1992. The *Wilder* court made clear in 1988 that although the rights of parents whose children are in the custody of the state are limited with respect to the parents' right to determine the religious upbringing of their children, the state cannot totally ignore the expressed religious preference of the parents and the children when placing children in foster care. *Wilder*, 848 F.2d at 1346–47. Plaintiff's allegation is that the state completely ignored the expressed religious preference of both plaintiff and her daughter. This aspect of plaintiff's right to free exercise of religion was clearly established in 1988, even if the exact nature of the "reasonable efforts" the state must make was not.

 After determining that the rights in question were clearly established at the time the defendants acted, the next inquiry is whether it was "objectively reasonable for [the officials] to believe that their acts did not violate [the plaintiff's] . . . rights." *Richardson v. Selsky*, 5 F.3d 616, 621 (2d Cir.1993). Defendants do not provide any affidavits explaining the decision to remove Elianne without first conducting a hearing and to place her in a Catholic home. On the face of the complaint, it is not possible to determine whether this conduct was objectively reasonable. Thus, the motion to dismiss plaintiff's due process and free exercise claims on the ground of qualified immunity raises issues of fact that cannot be decided on a motion to dismiss on the face of the complaint.

Defendants argue that because the Family Court ultimately found that plaintiff had neglected her daughter, any action taken with respect to the initial removal of plaintiff's daughter must have been objectively reasonable. However, whether removing plaintiff's daughter from plaintiff's custody in the manner in which plaintiff alleges she was removed, without any prior investigation and without a predeprivation hearing, was objectively reasonable is a question that cannot be resolved on the face of the complaint. The removal without notice or a hearing must be evaluated independently of any later adjudication of neglect. Whether it was reasonable to remove plaintiff's daughter from plaintiff's custody on an emergency basis depends on the facts known to the officials who removed plaintiff's daughter at the time she was removed, not a later finding that plaintiff was not a fit parent.

## XI. PERSONAL INVOLVEMENT

Defendants argue that defendants Giuliani, Dyson, Hammons, Kroft, and Little should be dismissed from this action because they were not personally involved in the alleged constitutional violations and, therefore, cannot be held liable under § 1983. Since the claims against Giuliani, Dyson, Hammons, and Kroft are barred by the statute of limitations, I address this argument only with respect to defendant Little.

 Under § 1983, liability may only be imposed on an individual defendant if the plaintiff proves that the defendant was personally involved in the alleged deprivation of constitutional rights. *Al–Jundi v. Rockefeller*, 885 F.2d 1060, 1066 (2d Cir. 1989). The Second Circuit has stated that personal involvement may occur in a variety of ways. "The defendant may have directly participated in the infraction[;] . . . [a] supervisory official, after learning of the violation through a report or appeal, may have failed to remedy the wrong[;] . . . [a] supervisory official may be liable because he or she created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue[;] . . . [or a] supervisory official may be personally liable if he or she was grossly negligent in managing subordinates who caused the unlawful condition or event." *Williams v. Smith*, 781 F.2d 319, 323 (2d Cir.1986) (citations omitted).

 Little argues that any claims against him as an individual should be

dismissed because he was not personally involved in the violation of any of plaintiff's rights. However, the complaint makes several allegations about the conduct of Little personally.

Plaintiff complains that Little was informed that Elianne should be placed in a Jewish home but did nothing. (Am. Compl.¶ 46.) The amended complaint also alleges that Little is responsible for the withdrawal of the agreement for a voluntary placement of Elianne with a Jewish agency. (Am.Compl.¶ 56.) Plaintiff alleges that Little engaged in a custom and practice of tolerating perfunctory investigations; negligently trained and supervised defendant Perry pursuant to a policy and custom of providing inadequate training; and that Little himself failed to investigate the claims against her prior to removing her children from her custody. (Am.Compl.¶¶ 75, 77–78.)

## XII. COLLATERAL ESTOPPEL

■ Collateral estoppel is an affirmative defense. As with all affirmative defenses, defendants have the burden of proving collateral estoppel. *See, e.g., Khandhar v. Elfenbein,* 943 F.2d 244, 247 (2d Cir.1991).

■ Federal courts must give the same preclusive effect to a state court judgment as the courts of the state would give to the judgment. 28 U.S.C. § 1738 (1994). Under New York law, collateral estoppel bars the relitigation of an issue if: (1) the issue is identical in the two proceedings; (2) the issue was actually determined in the prior proceeding; and (3) there was a full and fair opportunity to contest the issue in the prior action. *See Davis v. Halpern,* 813 F.2d 37, 39 (2d Cir.1987).

■ Defendants have provided a copy of the brief that plaintiff submitted to the Appellate Division on her appeal of the Family Court's neglect finding. In that appeal, plaintiff sought relief on a number of grounds. Plaintiff sought review of the finding of neglect, argued that she was denied due process because the proceedings against her had been so lengthy, and argued that her due process rights had been violated because of the absence of an adequate visitation schedule and family therapy. Plaintiff's own brief to the Appellate Division states that the Family Court had rejected these claims. (Def.Ex. H.)

Plaintiff's claims in Counts Three and Nine are identical to claims rejected by the Family Court. The determination by the Family Court also precludes plaintiff's state law claim of abuse of process. Plaintiff litigated the lengthy nature of the proceedings, and the state court determined that her due process rights had not been violated. Plaintiff has also litigated the services provided to her and her daughter with respect to their eventual reunification. The state court determined that plaintiff's due process rights had not been violated by any deficiency in the provision of those services.

■ In any event, even if plaintiff were not collaterally estopped from bringing a claim based on a failure of defendants to provide reunification services, plaintiffs "do not have a constitutional right to rely on an agency to strengthen and reunite their families even if that agency has a statutory duty to do so." *Marisol A. ex rel. Forbes v. Giuliani,* 929 F.Supp. 662, 677 (S.D.N.Y.1996) (quoting *Dixey v. Jewish Child Care Assoc.,* 522 F.Supp. 913, 916 (S.D.N.Y.1981)).

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is granted in part and denied in part. The motion is denied with respect to Counts One, Four, Five, Eight, and Ten, embodying claims that plaintiff was deprived of procedural due process, that plaintiff's right to the free exercise of religion was violated, and that plaintiff's right of privacy was violated. The motion is granted with respect to Counts Two, Three, Six, Seven, and Nine and with respect to the state law claims of malicious prosecution, abuse of process, libel, and

slander. Additionally, defendants Giuliani, Dyson, Hammons, Kroft, and the Catholic Home Bureau are dismissed from this action.

SO ORDERED.

## MEMORANDUM OPINION

Plaintiff moves for reconsideration of my opinion dated March 31, 2000, granting in part and denying in part defendants' motion to dismiss the complaint. For the following reasons, plaintiff's motion for reconsideration is denied.

Reconsideration may properly be granted when the moving party can show that "the court overlooked matters or controlling decisions which, had they been considered, might reasonably have altered the result." *Donahue v. Pendleton Woolen Mills, Inc.*, 719 F.Supp. 149, 151 (S.D.N.Y. 1988). Plaintiff has not identified any fact or cited any authority that was overlooked. All of the issues raised by plaintiff in her motion for reconsideration were carefully considered before the issuance of the opinion dated March 31, 2000. Accordingly, the motion for reconsideration is denied.

SO ORDERED.